1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6
7   1075 MARKET STREET OWNERS'
    ASSOCIATION,                             Case No.  19-cv-07313-SK
8
                     Plaintiff,
9                                            ORDER REGARDING MOTIONS TO
          v.                                 DISMISS
10
    THE UNITED STATES DEPARTMENT             Regarding Docket Nos. 13, 15, 16, 19
11  OF HEALTH & HUMAN SERVICES, et
    al.,
12
                     Defendants.
13

14          This matter comes before the Court upon consideration of the motions to dismiss filed by

15  Defendant City and County of San Francisco (the "City") and by Episcopal Community Services

16  of San Francisco ("ECS") and Mercy Housing California ("Mercy").  Having carefully considered

17  the parties' papers, relevant legal authority, and the record in the case, and having had the benefit

18  of oral argument, the Court hereby GRANTS the motions filed by the City, ECS, and Mercy for

19  the reasons set forth below.

20                            BACKGROUND[1]

21          Plaintiff 1075 Market Street Owners' Association ("Plaintiff") is challenging the decision

22  to build the entrance to a planned urgent care medical clinic within a planned mix-use

23  development at 1064 Mission Street on Stevenson Street.  Plaintiff is the incorporated

24  homeowner's association for the owners and residents in the mix-use, residential and commercial

25  building located at 1075 Market Street in San Francisco, California.  (Dkt. No. 1 (Complaint), ¶

26

27          [1] These background facts are taken from the well-pled allegations in the Complaint, as well
    as documents for which the Court may take judicial notice and documents which are incorporated
28  by reference in the Complaint.  As discussed below, the Court grants Requests for Judicial Notice
    made by the City and ECS and Mercy pursuant to Federal Rule of Evidence 201.

United States District Court
Northern District of California

17.)

This dispute centers on the placement of the entrance to the planned urgent care clinic, which has not yet been built.  There is a joint venture between the United States Department of Health and Human Services (the "US Dept. HHS"), the City, ECS and Mercy to build 256 housing units at what is currently a parking lot.  (*Id.*, ¶ 18.)  The United States owns or owned the land, and US Dept. HHS manages the land.  (*Id.*)  The US Dept. HHS has control over the terms for the development on the land.  (*Id.*)  Under the current plan, the entrance to the planned urgent care clinic will open on Stevenson Street, close to Plaintiff.  (*Id.*, ¶ 20.)  Specifically, a residential entrance, the sole motor vehicle entrance to the garage, and commercial space for the building located at 1075 Market Street are located on Stevenson Street, across the street and partly down the block from the planned entrance to the planned urgent care medical clinic.  (*Id.*, ¶ 17 and Ex. 1.)

Plaintiff seeks in this litigation an Order requiring Defendants to move the entrance to the planned urgent care medical clinic from Stevenson Street to Mission Street, on the other side of the planned development and a street away from one of the entrances to the building at 1075 Market Street.  Plaintiff alleges that the planned urgent care medical clinic will provide opioid addiction treatment and mental health services and will "exacerbate an already serious, uncontrolled, and lawless open-air drug market on Stevenson Street."  (*Id.*, ¶ 1.)

Plaintiff makes clear that Plaintiff does not oppose the planned urgent care medical clinic but only the location of the planned entrance.  (*Id.*, ¶¶ 1-3.)

**A.     Project Planning Documents.**

In its application for the development, Mercy described the project as follows:

> The project will consist of 105 studio units of affordable permanent supportive housing dwelling for formerly homeless seniors and 153 studio dwelling units of affordable permanent supportive housing for formerly homeless adults.  There will be two one bedroom units for staff persons to live onsite. . . . The building will be built as one structure but have separate residential entries, community serving spaces, property management offices and social services spaces, and circulation. . . . The project will also include a Health Services Center (HSC) which will include the Tom Waddell Urgent Care Clinic and Street Medicine team and the San Francisco Homeless Outreach Team (SF HOT).  This 19,936 square foot space will be developed by

1
2
3
4
5
6
7

[Mercy] but eventually transferred to the [City]. The Health Services Center will be co-operated by the [City's] Department of Public Health (DPH) and the Department of Homelessness and Supportive Housing (HSH). The HSC will be directly accessed by clients and staff from Stevenson Street with the ground floor of the clinic serving clients with urgent care, dental, case management, benefits counselling, and the 2nd floor having limited client access and largely medical offices for DPH and the SF Hot team. The project will also include an approximately 6,000 SF. Culinary training, social enterprise program for formerly homeless and homeless people. [ECS] will relocate their Conquering Homelessness through Employment in Food (C.H.E.F.'s) program to this location along Mission Street. . . .

(Dkt. No. 15-2 (City's RJN), Ex. B at p. 3.)

The Notice of Final Approval of an SB 35 Project by the City Planning Department states:

**PROJECT DESCRIPTION**

The project proposes the demolition of an existing three-story building and the construction of a six-story building with 260 dwelling units and an urgent care clinic, homeless outreach team, supportive services, culinary training, and social enterprise program spaces at the ground floor. The residential portion of the project will be 100% affordable for formerly homeless seniors and adults.

**BACKGROUND**

On August 1, 2018, [Mercy] submitted an SB 35 Application for the mixed-use project at 1068 Mission St. Department staff determined that the SB 35 Application was complete, and that the proposed project was eligible for SB 35 on August 21, 2018.

. . .

**PROJECT APPROVAL**

The Department has determined that the project meets all of the objective standards of the Planning Code including the concessions and incentives requested and waivers required by the State Density Bonus Law and Planning Code section 206.6 and has completed design review of the project. The project has been approved in accordance with the provisions of SB 35 (Government Code section 65913.4), as recorded in Building Permit Application No. 2018.1023.3860.

(Dkt. No. 19-2 (City's RJN), Ex. C.)

**B.      Waddell Health Clinic.**

The Waddell Health Clinic is located at 230 Golden Gate Avenue in San Francisco.

Plaintiff alleges that Joseph Pace, the medical director of the Waddell Health Clinic, made the following statement:

United States District Court
Northern District of California

3

> A lot of our patients will discuss how challenging it is for them to get to see us here [at the Tom Waddell clinic] and how they feel very vulnerable when they are being approached either to sell their medications or to trade their medications for other substances and especially for people who are trying to change towards clean and sober living, [the drug dealers outside the clinic] can be really triggering for them.
>
> In some ways it is hard to know how much [Tom Waddell clinics'] own arrival has inadvertently impacted [the area near Tom Waddell clinics].
>
> People who are interested in buying prescription drugs or selling drugs, this is where their market is . . . .
>
> [The Tom Waddell clinic is] both part of the problem, part of the solution at the same time.

(Dkt. No. 1, ¶ 23, Ex. 14) (emphasis omitted.)

Waddell Health Clinic provides the following description of the clinic and its services on its website:

> Tom Waddell Urban Health (TWUH), serves adults experiencing homelessness, residents of supportive housing, and other members of San Francisco's Tenderloin neighborhood community. Services are aligned with Health Care for the Homeless and Harm Reduction models. Specialty services include comprehensive HIV prevention and care; Hepatitis C treatment; office based opioid treatment; transgender care; integrated behavioral health services; podiatry and dental services.

(Dkt. No. 19 (ECS and Mercy's RJN), Ex. A.)  In contrast, the Tom Waddell Urgent Care Clinic, currently operating from an alley (Dr. Tom Waddell Place) behind the Health Department Headquarters on 101 Grove Street is the urgent care medical clinic which will be moving to the planned development on Stevenson Street.  (Dkt. No. 15-4 (City's RJN), Ex. E.)  The planned urgent care medical center will provide the following services: homeless dental services, urgent care, transitional primary care and behavioral health services.  (*Id*.)  It will not dispense opioids or other drugs with street value.  (*Id*.)

## C.   June 4, 2019 Health Fair.

On June 4, 2019, ECS and Mercy held an urban health street fair at the same address on Stevenson Street where the planned urgent care medical clinic will be located.  (Dkt. No. 1, ¶ 24.) The health fair attracted dozens of people.  (*Id*., ¶ 25.)  During the health fair, ECS and Mercy, only provided security inside the health fair area and no security on Stevenson Street.  (*Id*.)  Many

attendees obtained hypodermic syringes from the health fair and then used those syringes on Stevenson Street to inject illegal intravenous drugs and passed out.  The attendees on Stevenson Street refused to "move along" when requested to by business owners on Stevenson Street.  (*Id*., ¶ 26.)

On July 18, 2019, Eileen Loughran, Health Program Coordinator/Community Liaison for the City, admitted that while, in her opinion, drug crime was controlled inside the health fair, no one controlled street crime on Stevenson Street during the fair from and that there was criminal activity associated with the health fair on Stevenson Street.  (*Id*., ¶ 28.)

**D.**    **Present Neighborhood Crime.**

The United States owns and is responsible for the property in which the United States Court of Appeals for the Ninth Circuit is located at 95 Seventh Street in San Francisco.  The Courthouse also faces Stevenson Street and is directly adjacent to the planned development and planned urgent care medical clinic.  (*Id*., ¶ 31.)

Drug dealing and drug use and related gang and street crime take place on the Courthouse property "daily and nightly."  (*Id*., ¶ 32.)  In one example, on May 16, 2018, an individual who was injecting drugs on the steps of the Courthouse overdosed.  (*Id*.)  Plaintiff called 911 emergency for assistance.  (*Id*.)  The emergency medical personnel placed the man on a stretcher and wheeled him away.  (*Id*.)  There are countless other incidents of illegal, unhealthy, and deadly behavior have occurred and continue to occur on the Courthouse property.  (*Id*.)

The United States also owns and is responsible for the San Francisco Federal Building located at 90 7th Street in San Francisco.  (*Id*., ¶ 35.)  The San Francisco Federal Building faces Stevenson Street and is less than half a city block from the planned development.  (*Id*., ¶ 36.)  Drug dealing, drug use, and related gang and street crime take place on the San Francisco Federal Building property "daily and nightly."  (*Id*., ¶ 37.)  For example, on August 4, 2019, a person was assaulted and slashed in the neck while alighting a bus at the San Francisco Federal Building property.  (*Id*., ¶ 39 (citing Ex. 6 to Compl.).)

The United States has failed and fails to prevent drug dealing and drug use on both of these properties.  (*Id*., ¶¶ 34, 40.)

The City has also failed to control open-air drug dealing, drug use, and related gang, street, property, and other crime on Stevenson Street. (*Id*., ¶ 41.) "Daily and nightly," drug dealers sell drugs, drug users use drugs, drug dealers and drug users commit crimes, and business owners and residents on Stevenson Street call or otherwise request that the City stop the crime on Stevenson Street. (*Id*., ¶¶ 42, 44, 48, 50.) The City is unable or unwilling to arrest persons committing crimes and to stop drug-related and gang-related crime on Stevenson Street. (*Id*., ¶ 51.)

Mr. Smith's was a bar located at 34 7th Street in San Francisco, at the corner of 7th Street and Stevenson Street, less than half a block away from the planned entrance to the medical clinic. (*Id*., ¶ 52.) Almost daily, Mr. Smith's reported gang-related drug dealing in front of its building, including that gang members were threatening Mr. Smith's employees and even refusing them access to the bar. (*Id*. (citing Ex. 12 to Compl.).) The City could not or would not help. (*Id*.) In August 2019, Mr. Smith's closed. (*Id*.) It could no longer operate its business because of gang-related drug dealing that threatened its customers and employees. (*Id*., ¶ 53.)

The planned entrance to the planned urgent care medical clinic is also within less than a block of the entrance to the existing BAART Programs Market Street San Francisco. (*Id*., ¶ 20.) The BAART Programs Market Street San Francisco provides buprenorphine maintenance, detox options, and mental health services. (*Id*.) Plaintiff alleges that the BAART Program Market Street San Francisco facility daily and nightly attracts pervasive drug dealing, drug use, and gang and other street crime that the City has not controlled. (*Id*.)

**E.      ECS's and Mercy's Conversations with Plaintiff.**

In mid-2018, Plaintiff scheduled a meeting with the Developers[2] to discuss their plans for the property. (*Id*., ¶ 60 (citing Ex. 13 to Compl.).) On June 12, 2018, ECS and Mercy, on their own behalf and on behalf of the City and U.S. HHS, met with residents of 1075 Market. (*Id*., ¶ 61.) Plaintiff specifically asked ECS and Mercy whether the planned urgent care medical clinic would include services for opioid addiction treatment and mental health services. ECS and Mercy stated in certain terms that the planned urgent care medical clinic would not provide any such

---

[2] Plaintiff defines "Developers" as the U.S. HHS, the City, ECS and Mercy. (*Id*. at ¶ 1.)

United States District Court
Northern District of California

services.  (*Id.*, ¶¶ 22, 62, 69.)  From mid-2018 until April 29, 2019, the U.S. HHS, the City, ECS, and Mercy continued to make that representation.  (*Id.*, ¶¶ 22, 69.)

Explaining their plans for the development, ECS and Mercy stated that they planned to build affordable housing to help formerly long-term homeless adults and elders in San Francisco, with the residential entrance on Mission Street and with the entrance for administrative offices for medical personnel and a small-scale urgent care clinic for individuals on Stevenson Street.  (*Id.*, ¶ 64.)  In July 2018, ECS and Mercy formed an advisory committee for the new development and invited Plaintiff to become a member.  Plaintiff joined as a member to the advisory committee in August 2018.  (*Id.*, ¶¶ 65-67.)  At advisory committee meetings, ECS and Mercy did not correct the representations that the medical clinic would not provide opioid addition treatment or mental health services.  (*Id.*, ¶¶ 70-74.)

However, on April 29, 2019, ECS and Mercy held an advisory committee meeting, during which they disclosed that services offered by the medical clinic would also include a Buprenorphine Clinic (buprenorphine is a drug used to treat opioid addiction), Behavioral Health Services (psychosocial assessments, crisis intervention, etc.), and other services to persons who are considered "high risk and/or high vulnerability homeless San Francisco residents who are not engaged in primary care services."  (*Id.*, ¶ 75.)

**F.**    **Plaintiff's Proposals to Move the Clinic Entrance.**

On July 22, 2019, Plaintiff made a detailed proposal to the Developers to move the entrance to the planned urgent care medical clinic from Stevenson Street to Mission Street.  (*Id.*, ¶ 77 (citing Ex. 14 to Compl.).)  Plaintiff explained that an entrance to the planned urgent care medical clinic on Stevenson Street would exacerbate the existing drug trade on Stevenson Street and that moving the residential entrance from Stevenson Street to Mission Street would "activate" Stevenson Street, displace drug trafficking, and improve and stabilize Stevenson Street.  (*Id.*, 78.)

On August 5,[3] 2019, the City responded.  (*Id.*, ¶ 79; Dkt. No. 15-4 (City's RJN), Ex. E).)

---

[3] August "6" appears to be a typographical error.  The detailed, written response from the City to Plaintiff regarding its proposal is dated August "5."  (Dkt. No. 15-4 (City's RJN), Ex. E.) At the hearing on the City's and ECS and Mercy's motions to dismiss, Plaintiff confirmed that the letter dated August 6, 2019 is the same letter to which it was referring in Paragraph 79 in its

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1. Recommendation 1: Create foot traffic at scale with the resident entrances on Stevenson Street in order to activate the alley.

We evaluated many different machinations of the site plan in our preconceptual design phase in spring 2018. These were reviewed in the meetings in the spring that are listed in Attachment A where "site plan" is indicated as part of the agenda. While two of those initial site plans were near what you are requesting (see Attachment B), after extensive review and consideration we came to the conclusion that activation of Stevenson Street is best accomplished by locating the Homeless Services Center on Stevenson, which is open for longer hours each day than any of the other uses. The Homeless Services Center will bring the most foot traffic with approximately 100 full time professional and para professional staff on site. The San Francisco Department of Public Health (SF DPH) operated Tom Waddell Urgent Care Clinic (TWUC) will be open from Monday through Saturday from 8:00 am to 6:00 pm. Office hours for outreach and other staff at the San Francisco Homeless Outreach Team (SF HOT) will extend from early morning until evening seven days a week: Monday to Friday from 6:30 am to 10:00 pm and Saturday and Sunday from 10:30 am to 9:00 pm. There will be approximately 90 clients per day accessing services at the Homeless Services Center. The SF DPH and SF HOT staff will enter the Homeless Services Center through the emergency exit doors, activating those set-backs. For additional information on the operations and safety plan of the Homeless Services Center, please see Attachment F, FAQs on Homeless Services Center.

In contrast, and based on Mercy and ECS' 30+ years of experience providing housing and services to older adults and formerly homeless persons, we believe that the residential uses will not provide significant activation outside the residential building, especially in the evening hours. Additionally, locating a residential entry along Stevenson would require a significant setback for the building's main entry doors to allow residents to enter and exit and not obstruct the City sidewalk's accessible path of travel. Such a setback would likely provide a location for loitering, particular at night, which we believe works against our shared goals of activation and safety.

2. Recommendation 2: Place CHEF's program at alley to provide a reason to stay a while

While we are in complete agreement that a goal for the design of the Homeless Services Center and residential space, as well as activation programming (discussed below), should be, in part, to encourage residents and visitors to "stay a while," we don't believe the operation of the CHEFs achieves this result. The CHEFs program will be far less active than the Homeless Services Center as it is a culinary training center for homeless adults. Although its front of housing training space will be interactive during very limited hours selling food and drinks to the public, largely the CHEFs culinary training program will happen indoors and will not interact with the broader community. The CHEFs program is a training program, and not a

---

complaint.

restaurant or café, and its hours will be limited with program participants coming to class at 9 a.m. and leaving at around 3 p.m. Monday through Friday.   Please see the Attachment C, CHEFs Program Description for more information on the program structure.

3. Recommendation 3: Enable programming of alley through street closures

Again, we agree with your conclusion that activation of Stevenson Street is key to its transformation into a healthy, vibrant alley.   The City is committed to this activation as demonstrated through the Office of Economic and Workforce Development (OEWD) investments and leadership. . . .

. . . .The location of the Homeless Services Center will not prevent street programming, and any street closures or events will be coordinated with all users of the 500 block of Stevenson Street.   A residential entry on Stevenson Street would be no more or less restrictive than the Homeless Services Center in terms of allowing street closures.

In addition to the reasons outlined above, the site plan and design was created following best design practices for urban settings.   Including residential entries on Mission Street follows the immediate blocks' established land use pattern of residential entries along Mission Street and commercial or civic uses on the 500 block of Stevenson. Currently there is only one residential entry on the 500 block of Stevenson Street other than the Seneca Hotel at 6th Street.   The Mission Street residential entries are immediately accessible to public transit on Mission Street.   The well-travelled, wide sidewalk block will be more welcoming to seniors and disabled residents than the narrow 500 block Stevenson Street sidewalk.

The HSC's location on Stevenson provides good access to clients coming from Market Street and neighborhoods north of Market. However, we understand your concern that the Homeless Services Center will further contribute to the unsafe activity on the 500 block of Stevenson Street.   For that reason, SF DPH is committed to the TWUC door being open/unlocked throughout the daytime business hours and a sheriff being on site to assist with any unsafe conditions related to the TWUC.   Additionally, the TWUC staff and clients will have eyes on the street and will have a stake in this area being a particularly safe and positive place to work and to receive services.

Additionally, we believe that the Homeless Services Center will have a positive impact on the surrounding area by bringing help and experts in homeless care and outreach directly into an area that is currently a focal point for many of these problems.   We know from experience that the Street Medicine Team and the HOT team make a substantial difference to the environment where they work.   The overall project is part of the solution to major problems that afflict the neighbors, the block, the community, and the whole city.   The Tom Waddell Urgent Care Clinic, currently operating from an alley (Dr. Tom Waddell Place) behind the Health Department Headquarters on 101 Grove, is a safe and pleasant space, where clients are not creating unsafe

9

conditions on the street and where the SF DPH has been an active force in improving street conditions and ensuring a safe street.

In addition to looking at specific design impacts of your proposal, we also analyzed the impact to the project's feasibility should we undertake a redesign at this stage of design development.   The primary areas of impact are: 1) Project Timeline; 2) Project Cost; and 3) Project Feasibility.

1) <u>Impact on Project Timeline</u>

This site provides an extraordinary opportunity from the federal government to address one of the City's most pressing problems by bringing 256 people out of homelessness and into a home of their own.  To achieve this benefit, we must follow a strict timeline which requires all uses on site to be occupied by November 1, 2021 in order to obtain the site for a nominal cost of $1.  Over the last 17 months the project team has been working diligently to bring the design to completion.  They have received all Planning Department approvals, and are in the permitting process for building permits.  We currently anticipate starting construction in February 2020 to complete construction by September 2021 and occupy the building by November 2021.  To redesign the building would delay construction start by a minimum of nine months, resulting in construction completion and occupancy delay to June 2022.  According to this schedule, the project would miss the required "in operation" deadline by 9 months (see Attachment D), which would jeopardize the site acquisition under the Title V program.

2) <u>Impact on Cost</u>

In addition to a delay that threatens the basic feasibility of the project, a redesign would result in very significant cost overruns.  The increase in cost for redesign and re-permitting the building, construction cost escalation and the Title V penalty for completing 9 months after the November 1, 2021 deadline is projected to be $9,366,188 (see Attachment D).

3) <u>Impact on Project Feasibility</u>

The provisions of the three-year short term lease MOHCD has entered into make clear that if the development team cannot complete the project within the required timeframe, HHS' preliminary project approval and the short term lease could be rescinded which would jeopardize the entire effort.

In conclusion, although we believe we understand your underlying concerns, we cannot agree to your request because doing so would increase costs and create project delays that would threaten the basic viability of the project.  More importantly, we strongly believe the current design achieves many of the stated goals of the Stage 1075 neighbors, as described above, while balancing the needs of a complex program.

. . .

10

(Dkt. No. 15-4 (City's RJN), Ex. E).)  Attachment E to the letter dated August 5, 2019 is the

Community Safety Plan which states, in pertinent part:

> Homeless Services Center security

> - o   During the open hours of the Tom Waddell Urgent Care Clinic, an armed San Francisco Sheriff is on duty at the Clinic.

> - o   Combined program services will operate from Monday – Saturday 8 AM – 6 PM

> - o   The SF HOT staff work extended hours and will be coming and going throughout the day seven days a week, Monday – Friday from 6:30am - 10pm and Saturdays & Sundays 10:30am – 9pm.

> - o   SF Sheriff Deputy will be stationed in the Homeless Services Center during regular business hours to provide safety for clients, staff and visitors.  The Sheriff Deputy will patrol the area immediately surrounding the site with ancillary support provided by the mobile DPH SFSD unit as needed

> - o   Patient Navigators / Greeters will also assist with patient flow and help manage the space in front of the Homeless Service Center.

(Dkt. No. 15-4 (City's RJN), Ex. E).)  Attachment F to the letter dated August 5, 2019 is list of

Frequently Asked Questions, which states, in pertinent part:

> **1.  Is Tom Waddell Urban Health Clinic on Golden Gate Avenue moving to the new location on Stevenson?**

> No.  That clinic will stay where it is.  The Health Department is moving the Tom Waddell Urgent Care Team and Street Medicine team, currently operating from an alley (Dr Tom Waddell Place) behind the Health Department headquarters. These teams will operate as part of Whole Person Integrated Care clinical services.

> **2.  What will happen at the new Homeless Services Center?**

> The Center will be staffed by the City's top experts in homeless outreach and care.  It will feature Department of Public Health's Whole Person Integrated Care services including the specialized street medicine program and homeless dental services.  Services will include urgent care, transitional primary care and behavioral health services.   The Department of Homelessness and Supportive Housing's Homeless Outreach Team will be headquartered there and provide outreach and case management services.

> Operating Hours:
> On-site health services will be 8am to 6pm, Monday to Saturday.

United States District Court
Northern District of California

Office Hours for outreach and other staff will extend from early morning until evening seven days a week: Monday to Friday 6:30am to 10pm and Saturday & Sunday 10:30am to 9pm.

**3. Stevenson Alley is a very difficult environment. Today, people gather there to sell and use drugs. Homeless people spend all day and night there. Won't attracting more homeless people to the alley make matters worse?**

That is not our experience. The current location of the Urgent Care Clinic used to be very similar, with public drug use and encampments. Since the Street Medicine and HOT teams started to provide services there in 2015 the alley has improved significantly. We have found that when trust is established between providers and homeless clients, the environment they share improves. We expect that Stevenson Alley will get better when these services, and staff, are there every day. No opioids or other drugs with street value will be dispensed on site. A major focus of the program is providing integrated mental health and substance use disorder treatment. The Homeless Services Center is designed both physically and programmatically to avoid any need for lining up, congregating in front of, or loitering after services are provided.

. . .

**6.   Why is the entrance to the Homeless Services Center on Stevenson and not on Mission Street?**

The Homeless Services Center is located on the Stevenson side of the development, and does not extend all the way to Mission Street. Therefore, it is the safest and most practical and direct entrance. This has been part of the design and construction plan since the beginning. An ancillary benefit to the community of the entrance on Stevenson is that staff and clients will have a constant eye on situations and will have a stake in this area being a particularly safe and positive place to work and to receive services.

**7.  How will security be handled?**

These basics are already planned:
• The DPH clinic will have San Francisco Sherriff's Deputies staffing during open hours.
• Each of the ECS supportive housing buildings will have 24/7 lobby staffing, and a roving security team that can be called if there are problems.
• SFHOT will conduct outreach in the area, which will provide support for a better environment.
• The SFPD should be called if there are emergencies or criminal activity.
. . .

**8.  Why are services for homeless people part of this project?**

The Mayor's Office of Housing and Community Development (MOHCD) is the lead agency working with the Federal Department of Health and Human Services to purchase the site. The condition of

the site's purchase by the City is that it be used to serve people currently experiencing homelessness. The federal government requires that those services be put in place swiftly, and the development is to be complete by Fall 2021.

**9.  Is the Homeless Services Center a new idea for the project?**

The Homeless Services Center has been proposed at the site since February 2018 when the developer was selected. We presented the Homeless Services Center with the entry on Stevenson Street to the community at the May 2018 kick off meeting and have provided information about it at many of the community meetings since then.

**10.  When will these changes take place?  What is the process?**

• Per the federal government, the development must be constructed and occupied by November 1, 2021. To meet that deadline, construction will start in February 2020 and be completed in September 2021.
• The site plan and design has been approved by the Planning Department.
• The Mayor's Office of Housing and Community Development is the lead agency.
• Mercy Housing California and Episcopal Community Services are the joint developer.
• Episcopal Community Services will operate the residences for seniors and adults and provide services.
• The Department of Homelessness and Supportive Housing operates the Homeless Outreach Team (SFHOT) and the Department of Public Health runs the Street Medicine Team and Urgent Care Clinic

(Dkt. No. 15-4 (City's RJN), Ex. E).)

Plaintiff alleges that the Developers did not meaningfully address their legitimate safety and other concerns regarding the planned placement of the medical clinic on Stevenson Street. (Dkt. No. 1, ¶ 79.) Plaintiff further alleges that the Developers have no plans for managing the safety of Stevenson Street after the project is built. (*Id.*)

On September 13, 2019, Plaintiff again proposed moving the entrance door to the medical clinic. The Developers again rejected Plaintiff's proposal on October 8, 2019. (*Id*, ¶¶ 80-81.) In a letter dated October 8, 2019, the acting director of the City's Mayor's Office of Housing and Community Development responded to Plaintiff as follows:

In anticipation of our meeting on October 9, 2019, we are providing this letter that outlines our position. We have taken the time since our last meeting to further consult with colleagues at the Departments of Public Health and Homelessness & Supportive Housing, as well as the members of the development team to review your request that the entrance to the Homeless Services Center be moved from Stevenson Street to Mission Street. Consistent with our desire to be fully

13

transparent, we want to share our conclusions in advance of the meeting.

We have fully listened to your proposal, the evidence cited, and again examined the potential impact of a redesign of the site in good faith. However, we have reached the same conclusion that we did in August, and for the reasons previously cited will not undertake the design changes you have proposed.  That said, we continue to strive to be sensitive to issues you've raised regarding the conditions that exist today on and around the 500 block of Stevenson Street, and have developed the following additional offers and approaches to benefit the surrounding neighborhood and the clients and patients of the future Homeless Services Center.    We firmly believe that development of the overall project, including the Homeless Services Center, will provide beneficial activity on the surrounding blocks and will help ameliorate the conditions at the street level on Stevenson Street in multiple ways.

. . .

2. <u>Deputy Sheriff Position Hours and Duties</u> – The Department of Public Health has offered to staff the Deputy Sheriff position for one hour past the closing hour of the Urgent Care Clinic, to ensure that patients have safely exited the clinic and the surrounding area on Stevenson.  The Urgent Care Clinic hours will be 8AM – 6PM Monday through Saturday, and a deputy sheriff will remain on site until 7 PM.  The deputy sheriff will patrol the area outside the clinic on Stevenson on a periodic basis throughout the day.  In addition, office hours for outreach and other staff will extend from early morning until evening seven days a week: Monday to Friday 6:30 AM to 10 PM and Saturday and Sunday 10:30 AM to 9 PM.

The current location of the Urgent Care Clinic on Tom Waddell Place (the alley behind the 101 Grove DPH building) used to be similar to Stevenson Street with public drug use and encampments.  Since the Street Medicine and SF HOT teams started to provide services there in 2015, the alley has improved significantly.  No opioids or other drugs with street value will be dispensed on site at the Homeless Services Center.  A major focus of the program is providing integrated mental health and substance use disorder treatment.  The Homeless Services Center is designed both physically and programmatically to avoid any need to line up, congregate in front of or loiter after services are provided. . . .

Please note that there will be three security cameras on Stevenson Street covering the building frontage as part of the residential security plan.  Two residential 24 hour desk clerk positions will have access to the camera footage, and will communicate with the deputy sheriff, the roving security or the police as appropriate if they see illegal activity occurring.

3. <u>Street Activation</u> - We are very supportive of street activation on Stevenson Street and will continue to collaborate with OEWD and the project sponsors to support activation.  This commitment has been demonstrated by having the parking lot host the SF Night Markets and pop up community basketball court.  We support planning efforts for

streetscaping to create a more vibrant, pedestrian friendly space, and will collaborate with OEWD, DPW and MTA on these longer term efforts.  In the immediate term, the project will currently add three street trees, bike parking and street lighting.  The location of the Homeless Services Center is not an impediment to street activation, and ECS, DPH and HSH are eager to participate in block wide activation efforts such as movie nights and street fairs.  MOHCD will support OEWD in their efforts to find community serving businesses to fill vacant storefronts that currently exist on this block, and the development team is making every effort to lease the vacant 1075 Stage Stevenson Street commercial space in your building as the construction team's offices.

. . .

Again, although we cannot accede to your requested design changes, we recognize that there are significant quality of life issues that you as residents of the neighborhood confront every day.  We are confident that 1064-1068 Mission Street, in addition to providing critically needed housing and services to people experiencing homelessness, will contribute to the betterment of area and the activation of Stevenson Street in a very positive way.  We collectively – City agencies and the development and services teams – are committed to making that happen.

(Dkt. No. 15-4 (City's RJN), Ex. F).)

**G.     Plaintiff's Alleged Injuries and Claims.**

Plaintiff alleges that the one-day health fair exacerbated the existing problems on Stevenson Street, caused increased risks to health and safety, and negatively affected property values.  (Dkt. No. 1, ¶¶ 83, 86.)

Plaintiff brings a claim against the US Dept. HHS to enjoin a nuisance under federal common law nuisance based on the entrance to the planned urgent care medical clinic.  (Dkt. No. 1, ¶¶ 89-102.)  Plaintiff seeks a similar injunction against the City, ECS, and Mercy under California law for both a private and a public nuisance.  (*Id.*, ¶¶ 104-117, 119-133.)  Against just ECS and Mercy, Plaintiff also brings a claim for violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et al.* for the alleged unlawful practice of creating a nuisance and for the alleged misrepresentation that the planned urgent care medical clinic would not provide opioid addition treatment or mental health services, as well as a claim for attorney fees pursuant to California Code of Civil Procedure § 1021.5.  (*Id.*, ¶¶ 135- 140, 142-146.)

15

**ANALYSIS**

**A.    Applicable Legal Standard on Motion to Dismiss.**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted.  On a motion to dismiss under Rule 12(b)(6), the Court construes the allegations in the complaint in the light most favorable to the non-moving party and takes as true all material allegations in the complaint.  *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986).  Even under the liberal pleading standard of Rule 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Rather, a plaintiff must instead allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).  If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile.  *See, e.g. Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Lieche, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

As a general rule, "a district court may not consider material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds, Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (citation omitted).  However, documents subject to judicial notice, such as matters of public record, may be considered on a motion to dismiss.  *See Harris v. Cnty of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2011).  In doing so, the Court does not convert a motion to dismiss to one for summary judgment.  *See Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991).  The district court

United States District Court
Northern District of California

16

may also consider documents attached to and/or incorporated by reference in the complaint without converting the motion to dismiss into a motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "The court need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

**B.      Requests for Judicial Notice.**

The Court GRANTS the City's and ECS and Mercy's Requests for Judicial Notice pursuant to Federal Rule of Evidence 201.

The City requests that the Court take judicial notice of the planning documents related to the planned project and letters written by the City in response to Plaintiff's proposal to move the door to the planned urgent care medical clinic. Courts may consider documents on a motion to dismiss where "the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). In its complaint, Plaintiff refers to the letters written by the City in response to Plaintiff's proposal to move the door to the planned urgent care medical clinic and characterizes the contents of those letters. (Dkt. No. 1, ¶¶ 79, 81.) In its opposition to the City's request for judicial notice, Plaintiff does not contest the authenticity of these documents. Accordingly, the Court finds these letters, Exhibits E and F to the City's request, are incorporated into the Complaint by the Plaintiff's allegations and therefore, the Court grants the request to take judicial notice of them.

The City also requests that the Court take judicial notice of the project application, the notice of final approval, the architectural plans, and a copy of California Senate Bill 35 as matters of public record. Plaintiff does not dispute that these are matters of public record. Instead, Plaintiff argues that the City is improperly seeking that the Court take judicial notice of the facts contained within these documents. Because these are publicly-filed documents and because Plaintiff does not dispute that the authenticity of these documents or that these are accurate versions what the City represents that they are, the Court grants the City's request to take judicial

notice.  *See Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (noting that judicial notice is appropriate for "undisputed matters of public record") (internal citation omitted); *c.f. Lacayo v. Donahoe*, 2015 WL 993448, at *9 (N.D. Cal. Mar. 4, 2015) (in employment discrimination cases, courts may consider the administrative record of a plaintiff's claims before the agency as judicially noticeable matters of public record) (collecting cases).  The Court is taking judicial notice of the fact that the statements contained within the planning documents and responses to made to Plaintiff are the statements and responses made by the City and the project applicants, but the Court is not taking judicial notice of whether any statements or opinions stated within these documents are actually true.

In addition to the letter to which the Court already granted the City's request for judicial notice, ECS and Mercy request that the Court take judicial notice of the public website for the Tom Waddell Urban Health Clinic.  The location of the Tom Waddell Urban Health Clinic, who the medical director of the Tom Waddell Urban Health Clinic is, and what services it represents that it provides, are not subject to reasonable dispute. Fed. R. Civ. P. 201(b).  Therefore, the Court grants ECS and Mercy's request for judicial notice.

## C.  Standing.

ECS and Mercy move to dismiss Plaintiff's complaint based on lack of standing.

### 1.  Legal Standard.

Standing is a constitutional requirement of all federal courts, requiring plaintiffs to "demonstrate a personal stake in the outcome" in order to establish jurisdiction.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  Where a plaintiff lacks standing, a federal court "lacks subject matter jurisdiction over the suit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).  To satisfy the Constitution's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  A plaintiff must show sanding for each

United States District Court
Northern District of California

18

form of relief sought – whether it is injunctive relief, damages, or civil penalties. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.,* 528 U.S. 167, 185 (2000).

For injunctive relief, "the threat of injury must be 'actual and imminent, not conjectural or hypothetical.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Thus, "the 'threatened injury must be *certainly impending* to constitute injury in fact' and 'allegations of *possible* future injury are not sufficient.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original). "[A] plaintiff may allege a future injury" to satisfy the injury in fact "requirement, but only if he or she 'is *immediately* in danger of sustaining some *direct* injury as the result of the challenged . . . conduct and the injury or threat of injury is both real and immediate, not conjectural or hypothetical.'" *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 656 (9th Cir. 2002) (emphasis in *Scott*) (quoting *City of Los Angeles*, 461 U.S. at 102). "[A]lthough 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is '*certainly* impending.'" *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (emphasis in *Adarand*) (quoting *Lujan,* 504 U.S. at 565 n. 2). The inquiry is whether the plaintiff makes an adequate showing of injury "sometime in the relatively near future." *Id.*

Past wrongs are "insufficient by themselves to grant standing" for injunctive relief, but "are 'evidence bearing on whether there is a real and immediate threat of repeated injury.'" *Davidson*, 889 F.3d at 967 (quoting *City of Los Angeles*, 461 U.S. at 102 (internal quotation marks omitted). Where standing for injunctive relief "is premised entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that he will again be wronged in a similar way.'" *Id.* (quoting *City of Los Angeles*, 461 U.S. at 111). In determining whether an injury is similar, courts "must be careful not to employ too narrow or technical an approach." *Id.* Instead, court should examine the issue realistically and consider the context of the inquiry. *Id.* The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. *Lujan*, 504 U.S. at 561.

### 2.      Plaintiff's Allegations Do Not Satisfy the Legal Standard.

ECS and Mercy argue that Plaintiff fails to allege a non-speculative, imminent injury from the location of the door to the planned urgent care medical clinic which will be built in approximately two years.  ECS and Mercy also argue that Plaintiff's nuisance claims are not ripe. Plaintiff counters that it has already suffered injury from the one-day health fair held on June 4, 2019 and that the nuisance created by the one-day health fair and Pace's "predictions" regarding the impact from the planned urgent care medical clinic demonstrate that repeated injury is certainly impending.  However, Plaintiff's argument is not supported by its well-pled allegations and the documents from which the Court may take judicial notice.[4]

### i.      Lack of Past or Current Injury.

Whatever impact or injury Plaintiff suffered from the one-day health fair, the one-day health fair was separate and distinct from the planned urgent care medical clinic.  The one-day health fair was exactly as its name indicates – a one-day event and not a medical clinic open on a daily basis.  As Plaintiff alleges, the one-day health fair created a nuisance because it attracted dozens of people on the same day and because those people then obtained needles from the health fair.  (Dkt. No. 1, ¶¶ 24-26.)  Plaintiff does not make any similar allegations regarding the planned urgent care medical clinic – that it will attract dozens of people in one day or that the planned urgent care medical clinic will have a needle exchange program at which people would obtain needles.  Plaintiff simply does not allege any facts which, if true, would demonstrate that the one-day health fair and the planned urgent care medical clinic are the same entity, event, or nature such that Plaintiff could rely on the one-day health fair to show it has suffered an injury from the planned urgent medical care clinic or more specifically the from the location of the entrance for

---

[4] Plaintiff argues that the Court must presume that its allegations of fact relative to standing are true.  (Dkt. 28 (Opp. to ECS and Mercy's Mot.) at p. 15.)  Although the Court must take as true all of Plaintiff's material allegations, *see Sanders*, 794 F.2d at 481, the Court need not accept as true allegations which contradict matters properly subject to judicial notice or exhibit. *Sprewell*, 266 F.3d 988.  Additionally, the Court need not accept Plaintiff's unsupported conclusions or non-fact-based assertions.  *In re Facebook PPC Advert. Litig.*, 709 F. Supp. 2d 762, 768 (N.D. Cal. 2010) ("[A] court need not accept as true conclusory allegations, unreasonable inferences, legal characterizations, or unwarranted deductions of fact contained in the complaint.") (citing *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754-755 (9th Cir. 1994)).  In other words, merely alleging something in a complaint does not render it a "fact" which the Court must accept as true.

United States District Court
Northern District of California

1    the planned urgent medical care clinic.  Therefore, even if Plaintiff has sufficiently alleged that the

2    one-day health fair created a nuisance which caused Plaintiff harm, Plaintiff has not sufficiently

3    alleged that it has suffered an injury from the location of the entrance to the planned urgent care

4    medical clinic, which has not yet opened.

5                    **ii.      Lack of Credible Threat of Future Injury.**

6             As discussed below, it is not clear whether Plaintiff can demonstrate injury-in-fact solely

7    by relying on a threat of future injury in this non-environmental case and in the absence of any

8    actual injury.  Nevertheless, Plaintiff does not allege facts sufficient to satisfy the requisite

9    standard because Plaintiff does not allege a "credible threat of harm" that is "both real and

10   immediate, not conjectural or hypothetical.  *See Krottner v. Starbucks Corp*., 628 F.3d 1139, 1143

11   (9th Cir. 2010) (citations omitted).  As the court in *Davidson* noted, to show standing to obtain

12   injunctive relief, "the threatened injury must be *certainly impending* to constitute injury in fact and

13   allegations of *possible* future injury are not sufficient."  *Davidson*, 889 F.3d at 967.

14            For similar reasons as to why the one-day health fair does not show Plaintiff has suffered

15   an injury, the one-day health fair also does not constitute non-speculative facts regarding what

16   impact the entrance location to the planned urgent care medical clinic may or may not have on

17   Stevenson Street.  In addition to treating patients on an individualized basis, as opposed to *en*

18   *masse*, the plans for the clinic include safety measures and resources which may impact whatever

19   effect the planned urgent care medical clinic, or more specifically the location of the entrance to

20   the clinic, may have on the neighborhood.  The planned urgent care medical clinic and the San

21   Francisco Homeless Outreach Team will be part of the Homeless Services Center.  The Homeless

22   Services Center will have approximately 100 full-time professional and para-professional staff on

23   site from 8:00 a.m. to 6:00 p.m. Monday through Saturday for the planned urgent care medical

24   clinic and from 6:30 a.m. to 10:00 p.m. on Monday through Friday and from 10:30 a.m. to 9:00

25   p.m. on both weekend days for the San Francisco Homeless Outreach Team.  (Dkt. No. 15-4

26   (City's RJN), Ex. E.)  The planned urgent care medical clinic will have a San Francisco Sheriff

27   Deputy on site, from 8:00 a.m. to 7:00 p.m. Monday through Saturday, who will periodically

28   patrol the area immediately surrounding the clinic with ancillary support provided by the mobile

Department of Public Health San Francisco Sheriff Department unit as needed.  (*Id*., Exs. E, F.)  Patient Navigators/Greeters will assist with patient flow and managing the space in front of the Homeless Service Center.  (*Id*., Ex. E.)  Each of the supportive housing buildings in the planned development will have a roving security team which can be called if there are problems.  (*Id*.)  The Homeless Services Center is designed both physically and programmatically to avoid any need to line up, congregate in front of or loiter after services are provided.  (*Id*., Ex. F.)  Additionally, there will be three security cameras on Stevenson Street covering the building frontage.  Two residential 24-hour desk clerk positions will have access to the camera footage, and will communicate with the deputy sheriff, the roving security or the police as appropriate if they see illegal activity occurring.  (*Id*.)

Whether these resources or safety measures will, in fact, be effective is not an inquiry the Court can or should engage at this point.  Regardless of their actual, eventual effectiveness, the existence of these planned additional resources and safety measures at the very least distinguishes the planned urgent care medical clinic from the one-day health fair and thus undermines any predictive value from the one-day health fair.

In addition, in contrast to the health fair which was over in one day, the planned urgent care medical clinic will be ongoing.  Therefore, as ECS and Mercy note, they will have an opportunity to evaluate conditions over time and to make modifications to ameliorate any problems.  Again, regardless of whether any modifications are eventually made and/or would be effective, the fact that they will have an *opportunity* to evaluate and address any negative impact over time further distinguishes the planned urgent care medical clinic from the one-day health fair.  Therefore, the Court finds that Plaintiff's well-pled allegations regarding the one-day health fair do not have any predictive value of what may or may not happen when the planned urgent care medical clinic eventually opens in two years.  In other words, Plaintiff's allegations, even if true, fail to show that the location of the door to the planned urgent care medical clinic creates a "credible threat of harm" that is "both real and immediate, not conjectural or hypothetical."  *Krottner*, 628 F.3d at 1143.

Plaintiff also relies on comments Pace made regarding the full-service health clinic on

United States District Court
Northern District of California

1    Golden Gate Avenue and argues that his comments predict that the planned urgent care medical

2    clinic will create a nuisance.  Plaintiff alleges that Pace, the medical director of the full-service

3    Waddell Health Clinic stated that it was *hard to know* how much the clinic's arrival had

4    inadvertently impacted the area near the clinic and that the clinic was both part of the problem and

5    *part of the solution* at the same time.  (Dkt. No. 1, ¶ 23, Ex. 14.)[5]  Pace's statement does not

6    definitively state that the full-service health clinic has caused a nuisance in the immediate area

7    outside of the clinic.  Instead, it is an ambiguous statement regarding whether the full-service

8    clinic, by bringing vulnerable people receiving medications to the clinic, has negatively affected

9    the neighborhood, given that the clinic is also part of the solution.

10        Additionally, it can be inferred from Pace's quoted statement that the full-service health

11    clinic dispenses prescription drugs.  (*Id.* ("People who are interested in buying prescription drugs .

12    . . this is where their market is").)  In contrast, the planned urgent care medical center will not

13    dispense opioids or other drugs with street value.  (Dkt. No. 15-4 (City's RJN), Ex. E.)  Therefore,

14    even if Pace's statement could be interpreted as an acknowledgement that the full-service health

15    clinic has contributed to deteriorating conditions in the clinic's immediate neighborhood, it does

16    not "predict" in a non-speculative manner what conditions the location of the entrance to the

17    planned urgent care medical clinic may or may not create on Stevenson Street.

18        Adding another level of uncertainty to what, if any, negative impact the door to the

19    planned urgent care medical clinic may have are Plaintiff's allegations regarding the current state

20    of the neighborhood and the fact that, regardless of where the entrance is located, the planned

21    urgent care medical clinic will be in the planned development.  According to Plaintiff, a nuisance

22    already exists.  The drug dealers and addicts are already in the neighborhood, including on

23    Stevenson Street.  Plaintiff alleges that the current conditions on Stevenson Street and the

24    surrounding neighborhood are already problematic.  According to Plaintiff, drug-dealing and use

25    and related gang and street crimes occur in that area daily and nightly.  (Dkt. No. 1, ¶¶ 32-34, 37-

26    40, 42-50.)  It is unclear whether the planned urgent care medical clinic will attract additional drug

27

28        [5] Plaintiff's representation of Pace's full statement is quoted in full in the background
section above.

United States District Court
Northern District of California

United States District Court
Northern District of California

dealers and/or addicts, or merely provide urgent care to persons already in the neighborhood. Moreover, it is not clear, even if the planned urgent care medical clinic does attract additional drug dealers and/or addicts, whether the *location of the entrance*, or the *presence of the clinic itself* in the planned development regardless of the location of its entrance, would be the contributing factor. Due to all of these uncertainties and the lack of any non-speculative allegations regarding any impact of the location of the entrance to the planned urgent care medical clinic, the Court finds that Plaintiff fails to allege a credible threat of harm.

### iii.    Lack of Imminence.

An additional, independent problem with Plaintiff's standing for injunctive relief is that its alleged impact may be too distant to be considered impending. As the Supreme Court has made clear, "although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose." *Adarand Constructors*, 515 U.S. at 211. "Impending" means the injury must occur "sometime in the relatively near future." *Id.* The planned urgent care medical clinic is not yet built. Construction is not even scheduled to be completed until September 2021. (Dkt. No. 15-4 (City's RJN), Ex. E.) It appears doubtful that almost two years satisfies the requirement of an injury "sometime in the relatively near future." Plaintiff does not cite to any cases showing that a harm projected two years in the future satisfies this requirement.

### 3.    Plaintiff's Authority Fails to Demonstrate Standing Exists.

None of the cases to which Plaintiff cites demonstrate standing under circumstances factually analogous to Plaintiff's allegations. Plaintiff relies primarily on two environmental cases – *Bennett v. Spear*, 520 U.S. 154 (1997) and *Central Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002). As the Ninth Circuit explained in *Central Delta*, a credible threat of harm is sufficient to satisfy standing requirements in environmental cases for specific reasons unique to environmental cases:

> The ability to challenge actions creating threatened environmental harms is particularly important because in contrast to many other types of harms, monetary compensation may well not adequately return plaintiffs to their original position. The extinction of a species, the destruction of a wilderness habitat, or the fouling of air and water are harms that are frequently difficult or impossible to remedy. Thus, as the Fourth Circuit noted in *Gaston Copper,* plaintiffs need not wait

until the natural resources are despoiled before challenging the government action leading to the potential destruction.

*Central Delta*, 306 F.3d at 950 (citing *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 159-60 (4th Cir. 2000)); *see also Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 860 (9th Cir. 2005) ("To require actual evidence of environmental harm, rather than an increased risk based on a violation of a statute, misunderstands the nature of environmental harm and would unduly limit the enforcement of statutory environmental protections.") (internal brackets and quotation marks omitted).

Even if this standard – a credible threat of future injury – is applicable to non-environmental cases, the facts of *Bennett* and *Central Delta* are not analogous to the alleged circumstances here.  In *Bennett*, the United States conceded that less water would be available to all reservoir users in the aggregate and did not contend that such allegation was speculative.  Instead, the government merely argued that the petitioners failed to show that the *petitioners* would receive less water.  *Bennett*, 520 U.S. at 167.  In light of the uncontested allegations that the aggregate amount of water would be reduced, the Court accepted Petitioner's presumption that their pro-rata share would be reduced as well.  *Id*.

In *Central Delta*, the government's own statistical model demonstrated that the planned plan, if put into effect, would violate the salinity standard (and damage the plaintiffs' crops) in sixteen percent of the months when the plaintiffs relied on irrigation.  306 F.3d at 948-49.  The court also noted that the plaintiffs had suffered damage to their crops in the past due to high salinity and that they had submitted scientific reports documenting the negative effects of salinity on their crops.  *Id*. at 949.

In *Massachusetts v. Environ. Protect. Agency*, another environmental case, the plaintiff was a sovereign state enforcing a procedural right, and thus was "entitled to special solicitude in [the] standing analysis."  549 U.S. 497, 520 (2007).  Moreover, Massachusetts had already been injured by the "serious" and "well recognized" harms associated with climate change.  *Id*. at 521.  The issue instead was redressability and whether regulation by the agency would mitigate global climate change.  *Id*. at 523.

In the two non-environmental cases on which Plaintiff relies, the plaintiffs had already

25

suffered injury.  In *Krottner*, the plaintiff's personal information, including their names, addresses, and social security numbers, had already been stolen.  628 F.3d at 1140.  In *Davidson*, the plaintiff already suffered injury by the premium she paid for the falsely advertised product, flushable wipes.  889 F.3d at 965-66.  The plaintiff also alleged that she would purchase the product again from the defendant if the product were actually flushable and that she was continually presented with the defendant's packaging but had no way to determine whether the representations were accurate.  *Id*. at 970-71.  The Ninth Circuit held that her knowledge of the defendant's misrepresentations did not preclude her from alleging threat of future harm by relying again on the defendant's representations.  *Id*. at 969.

Therefore, the Court finds that Plaintiff fails to allege facts sufficient to establish it has standing to seek injunctive relief on its nuisance claims and thus grants ECS and Mercy's motion on this ground.  However, because the Court cannot determine that leave to amend would be futile, the Court will provide Plaintiff with an opportunity to amend its complaint if it can allege additional facts in good faith.

### D.    Plaintiff's Nuisance Claims.

Because the Court is granting leave to amend, the Court will address ECS and Mercy's and the City's motions on the grounds that Plaintiff fails to allege sufficient facts to state its nuisance claims.  Plaintiff brings two nuisance claims against the City and against ECS and Mercy – one for private nuisance and one for public nuisance.  California law defines a nuisance as "[a]nything which is injurious to health, . . ., or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property."  Cal. Civ. Code § 3479.  To recover for nuisance, a plaintiff must establish the existence of an interference that substantially and unreasonably affects the use and enjoyment of her property. *Koll-Irvine Ctr. Property Owners Ass'n v. County of Orange,* 24 Cal. App. 4th 1036, 1041 (1994).

The difference between a private and a public nuisance is the affected party.  "A nuisance is common or public where it affects the rights enjoyed by citizens as part of the public, that is, the rights to which every citizen is entitled.  A private nuisance is one that affects a single individual or a determinate number of persons in the enjoyment of some private right not common to the

26

1    public." *Reinhard v. Lawrence Warehouse Co.*, 41 Cal. App. 2d 741, 745 (1940) (quotations

2    omitted).

3         **1.    Speculation of Future Injury.**

4         The City, ECS and Mercy move to dismiss both of Plaintiff's nuisance claims against it on

5    the grounds that Plaintiff asserts only speculation of a future injury – a nuisance caused by the

6    location of the entrance to the planned urgent care medical clinic after the property is developed.

7    "A mere possibility or fear of future injury" is insufficient under California law. *Beck Dev. Co. v.*

8    *S. Pac. Transportation Co.*, 44 Cal. App. 4th 1160, 1213 (1996); see also *Helix Land Co. v. City of*

9    *San Diego*, 82 Cal. App. 3d 932, 950 (1978) ("An essential element of a cause of action for

10   nuisance is damage or injury. . . . Helix's charges of injuries, at this time, are not present, real or

11   ascertainable.  Helix may not recover damages for potential, future injuries arising from the threat

12   of nuisance.") (citation omitted); *Jordan v. City of Santa Barbara*, 46 Cal. App. 4th 1245, 1257

13   (1996) ("Damage or injury has long been considered an essential element of a cause of action for

14   nuisance.").[6]

15        "In order for a private party to enjoin an alleged public nuisance on the ground of fear of

16   future injury, it must, at a minimum, establish facts to prove that the apprehension of injury is well

17   founded." *Beck*, 44 Cal. App. 4th at 1213 (citing *Payne v. McKinley*, 54 Cal. 532, 533(1880)).

18   "Thus, while no one has the right to inflict unnecessary and extreme danger to the life, property

19   and happiness of others . . ., to establish a nuisance the plaintiff must demonstrate an actual and

20   unnecessary hazard." Id.  (citations omitted).

21        The same is true of private nuisance claims.  *See Koll-Irvine*, 24 Cal. App. 4th at 41-42

22   (holding a private nuisance claim "cannot be maintained for an interference in the use and

23   enjoyment of land caused solely by the fear of a future injury").  In *Knoll-Irvine*, the plaintiffs

24   asserted that large above-ground fuel storage tanks located in the airport near the plaintiffs'

25

26        [6] Plaintiff's reliance on *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51 (2017)

27   is misplaced.  In *ConAgra*, the court held the nuisance claim had merit where there was
     "*substantial evidence* that interior residential lead paint *had been causing and* will *continue* to

28   cause *harm* to children."  *Id*. at 110 (emphasis added).

United States District Court
Northern District of California

property presented a severe and unnecessary risk of damage from fire and the release of toxic

chemicals.  The plaintiffs alleged that the proximity of the fuel tanks and the extreme risk it posed

caused the plaintiffs to live in fear of destruction of their lives and property as a result of a

potential aircraft accident or rupture of the tanks.  *Id*. at 1039.  The court rejected the plaintiff's

private nuisance claim because they only alleged a fear of being in the future, not a present injury.

*Id*. at 1041-42.

As discussed above, Plaintiff has not alleged any well-pled facts which, if true, show it

already has been injured by the location of the entrance to the planned urgent care medical clinic.

Additionally, Plaintiff has not alleged facts which, if true, show more than a mere *possibility* or

*fear* of future injury.  Accordingly, the Court finds that Plaintiff fails to allege facts sufficient to

state a claim for nuisance, public or private.

**2.      Proximate Causation.**

The City, ECS and Mercy argue that Plaintiff's nuisance claims fail for a second,

independent reason – Plaintiff has not and cannot allege causation because the criminal acts of

others caused Plaintiff's alleged nuisance.  (Dkt. No. 13 at 13.)  "[C]ausation is an essential

element of a public nuisance action."  *Citizens for Odor Nuisance Abatement v. City of San Diego*,

8 Cal. App. 5th 350, 361 (2017).  "A property owner who fails to take reasonable actions to

prevent criminal activity on the owner's property may be subject to nuisance liability if that

criminal activity harms the surrounding community."  *Benetatos v. City of Los Angeles*, 235 Cal.

App. 4th 1270, 1282-83 (2015) (citation omitted).  However, Plaintiff has not alleged sufficient

facts to state a nuisance claim under this theory.  First, as discussed above, it is far from clear that

the entrance to the planned urgent care medical clinic will create a nuisance.  Second, even if

Plaintiff did allege facts to show that the entrance to the planned urgent care medical clinic will

create a nuisance, Plaintiff have not alleged any facts which, if true, show that Defendants have

failed to take reasonable actions to prevent criminal activity on the premises.  Therefore, the Court

grants the City's and ECS and Mercy's motions as to Plaintiff's nuisance claims nuisance against

them.

It is not clear what facts Plaintiff could allege to show Defendants' failure to take

United States District Court
Northern District of California

28

1  reasonable actions to prevent something that has not happened yet, because the planned urgent

2  care medical clinic has not opened yet.  As discussed above, the plans for the clinic include safety

3  measures and resources which may mitigate any effect the placement of door to the planned urgent

4  care medical clinic may have on the neighborhood.  The Court will provide Plaintiff with leave to

5  amend.[7]  Plaintiff is required to plead non-speculative facts which, if true, would show that these

6  safety measures and resources are ineffective and that there are other reasonable actions

7  Defendants could, but failed to, take to prevent criminal activity on the premises.

8  **E.      Plaintiff's UCL Claim Against ECS and Mercy.**

9         To have standing under California law to bring a claim for violation of the UCL, a plaintiff

10 must show that he or she has "suffered injury in fact and [ ] lost money or property as a result of

11 the unfair competition."  Cal. Bus. & Prof. Code § 17204.  This provision requires a plaintiff to

12 sufficiently allege: (1) he or she has "lost 'money or property' sufficient to constitute an 'injury in

13 fact' under Article III of the Constitution" and (2) there is a "causal connection" between the

14 defendant's alleged UCL violation and the plaintiff's injury in fact.  *Rubio v. Capital One Bank*,

15 613 F.3d 1195, 1203-04 (9th Cir. 2010) (citations omitted).  As discussed above, regardless of

16 whether the property values dropped as a result of the one-day health fair, Plaintiff fails to allege it

17 suffered any injury in fact from the location of the door to the planned urgent care medical clinic

18 which as yet to open.  Therefore, Plaintiff has not alleged facts sufficient to establish standing to

19 bring a UCL claim.

20        In addition, with respect to Plaintiff's alleged misrepresentation by ECS and Mercy

21 regarding what services would be provided at the planned urgent care medical clinic, Plaintiff has

22 not alleged any facts to show any economic injury from such alleged misrepresentation or

23 explained how any economic injury it could allege was caused by such misrepresentations.

24 Plaintiff's reliance on *Davidson* to show injury and causation is misplaced.  (*See* Dkt. No. 28 at

25 23.)  As discussed above, the plaintiff in *Davidson* was injured by the misrepresentation by

26

27         [7] The City raises additional arguments, such as the argument that California Civil Code §
   3482 bars Plaintiff's nuisance claim.  However, unless and until Plaintiff pleads facts sufficient to
28 state a claim for nuisance, it is difficult to determine the scope of Plaintiff's claim and whether,
   even if Plaintiff adequately alleges injury and causation, Section 3482 bars the claim.

United States District Court
Northern District of California

spending a premium for falsely advertised product, the flushable wipes.  889 F.3d at 965-66.  The only issue in *Davidson* was whether the court could accept the plaintiff's allegations that she would be injured again in the future now that she knows the wipes were not actually flushable.  *Id.* at 969 (holding that plaintiff's knowledge of the defendant's misrepresentations did not preclude her from alleging threat of future harm by relying again on the defendant's representations).  Therefore, the Court grants ECS and Mercy's motion as to Plaintiff's UCL claim against them.[8]

## CONCLUSION

For the foregoing reasons, the Court GRANTS the City's and ECS and Mercy's motions to dismiss Plaintiff's second through five claims.  As noted above, the Court is granting Plaintiff leave to amend.  Plaintiff shall file its amended complaint, if any, by no later than February 28, 2020.  Along with its amended complaint, if any, Plaintiff shall file a redline version of the amended complaint comparing it to the complaint filed on November 6, 2019.

**IT IS SO ORDERED**.

Dated: February 11, 2020

_____

SALLIE KIM
United States Magistrate Judge

United States District Court
Northern District of California

---

[8] In its claim for attorneys' fees, Plaintiff seeks to recover attorneys' fees for conferring a significant benefit on the general public or a large class of persons for having the entrance to the planned urgent care medical clinic moved.  However, because the Court is dismissing Plaintiff's nuisance and UCL claims against ECS and Mercy, the Court is dismissing Plaintiff's claim for attorneys' fees as well.